ALEXANDER E. POTENTE, State Bar No. 208240
alex.potente@clydeco.us
TIMOTHY J. WITCZAK, State Bar No. 308739
timothy.witczak@clydeco.us
CLYDE & CO US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile:  (415) 365-9801

Attorneys for Plaintiff
ARROWOOD INDEMNITY COMPANY,
formerly known as ROYAL INSURANCE
COMPANY OF AMERICA, and successor to
ROYAL GLOBE INSURANCE COMPANY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| ARROWOOD INDEMNITY COMPANY, a Delaware corporation, formerly known as ROYAL INSURANCE COMPANY OF AMERICA, and successor to ROYAL GLOBE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>R AND L BUSINESS MANAGEMENT, formerly known as STOCKTON PLATING, INC., a California corporation; JOHN R. CLARK, an individual; ESTATE OF NICK SMITH, deceased; the CITY OF WEST SACRAMENTO; and ROES 1-50, inclusive,<br><br>Defendants. | Case No.<br><br>COMPLAINT FOR DECLARATORY JUDGMENT [28 U.S.C. § 2201]<br><br>JURY TRIAL DEMANDED |

Arrowood Indemnity Company ("Arrowood"), formerly known as Royal Insurance Company of America, as successor to Royal Globe Insurance Company, hereby alleges as follows:

## JURISDICTION AND VENUE

1. Arrowood is a Delaware corporation with its principal place of business in Charlotte, North Carolina and is duly authorized to transact insurance business in California.

2. Federal jurisdiction is proper pursuant to 28 U.S.C. § 1332. The parties are citizens of different states, as Arrowood maintains its headquarters in North Carolina, where it directs, controls, and coordinates the corporation's activities and it is incorporated in State of Delaware. It is therefore a citizen of both North Carolina and Delaware. All defendants, as alleged below, are California citizens. Arrowood seeks resolution of an insurance coverage dispute wherein Arrowood's potential indemnity obligation is greater than $75,000 exclusive of interest and costs.

3. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(a)(2), as the situs of the allegedly contaminated real property, which gave rise to this insurance coverage action, is located in West Sacramento, within the Eastern District of California.

## NATURE OF ACTION

4. This is a civil action for declaratory judgment pursuant to 28 U.S.C. § 2201 to determine the rights and obligations, if any, of Arrowood, formerly known as Royal Insurance Company of America ("Royal") and successor to Royal Globe Insurance Company ("Royal Globe"), under insurance policies Royal and Royal Globe issued to Stockton Plating, Inc. (collectively, the "Policies"). At issue are Arrowood's obligations, if any, to pay indemnity for environmental pollution arising from the operation of a metal plating facility located at 319 3rd Street, West Sacramento, California (the "Property") under the Policies.

## PARTIES

5. Defendant R and L Business Management, formerly known as Stockton Plating, Inc., is a corporation organized under the laws of the state of California with its principal place of business in Stockton, California and is the successor in interest to Stockton Plating, Inc.

6. Defendant John Clark ("Clark"), an individual, is a citizen of California who resides in Fresno, California. He served as general manager of Stockton Plating, Inc.'s facility in

West Sacramento from 1973 through 1982 and operated the metal plating business at the Property during that time.

7.  Defendant Nick Smith ("Smith") is a deceased individual who formerly resided in California. The Estate of Nick Smith is being sued pursuant to California Probate Code § 550, et seq. Smith was a former owner and operator of Stockton Plating, Inc.'s facility in West Sacramento, and, through Stockton Plating, Inc., operated a metal plating business at the Property from 1973 through 1984.

8.  Defendant City of West Sacramento is being sued in its capacity as a municipal entity organized under the laws of the State of California and in its representative capacity on behalf of the People of the State of California of West Sacramento. The City and the People of the State of California of West Sacramento comprise a single entity (collectively "the City of West Sacramento" or "the City"). The State of California is not a party to this action.

## FACTUAL ALLEGATIONS

### A.  The Insurance Policies

9.  Royal Globe issued policy no. PYA920360 to named insured Stockton Plating, Inc., for the policy period April 1, 1976 to April 1, 1979.

10. Royal Globe issued policy no. PYA154515 to named insured Stockton Plating, Inc., for the policy period April 1, 1979 to April 1, 1982.

11. Royal issued policy no. PYA265377, to named insured Stockton Plating, Inc., for the policy period April 1, 1982 to April 1, 1985.

12. Royal issued policy no. PYA300207, to named insured Stockton Plating, Inc., for the policy period April 1, 1985 to April 1, 1986.

13. The Policies each provide comprehensive general liability insurance pursuant to the following terms:

**I. COVERAGE A – BODILY INJURY LIABILITY**

**COVERAGE B – PROPERTY DAMAGE LIABILITY**

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

  A. **bodily injury or**

  B. **property damage**

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

The terms "insured," "occurrence" and "property damage" are defined in the Policies as follows:

When used in this policy (including endorsements forming a part hereof):

\* \* \*

"insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

\* \* \*

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

\* \* \*

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

\* \* \*

The comprehensive general liability form includes the following "Persons Insured" provision:

## II. PERSONS INSURED

Each of the following is an insured under this insurance to the extent set forth below:

\* \* \*

(c) if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

\* \* \*

The policies are subject to the following exclusion, among others:

**Exclusions**

This insurance does not apply:

\* \* \*

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

\* \* \*

(k) to property damage to

    (1) property owned or occupied by or rented to the insured;

    (2) property used by the insured, or

    (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured;

\* \* \*

### III. LIMITS OF LIABILITY

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:

\* \* \*

**Coverage B** – The total liability of the company for all damages because of property damage sustained by one or more persons or

organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence".

* * *

**Coverages A and B** – For the purpose of determining the limits of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

* * *

The policies are subject to the following general provisions, among others:

### CONDITIONS

* * *

**10. Three Year Policy** If this policy is issued for a period of three years any limit of the company's liability stated in this policy as "aggregate" shall apply separately to each consecutive annual period thereof.

* * *

14. True and correct copies of the Royal Globe policy no. PYA920360, to named insured Stockton Plating, Inc., for the policy period April 1, 1976 to April 1, 1979 and policy no. PYA154515 for the policy period April 1, 1979 to April 1, 1982 are attached hereto as Exhibits A and B, respectively.

15. True and correct copies of the Royal policy no. PYA265377, to named insured Stockton Plating Inc., for the policy period April 1, 1982 to April 1, 1985 and policy no. PYA300207 for the policy period April 1, 1985 to April 1, 1986 are attached hereto as Exhibits C and D, respectively.

**B.  Underlying Action Against R And L, Clark, And Smith**

16. The City of West Sacramento filed a complaint against multiple defendants on April 12, 2018, in the United States District Court for the Eastern District of California, Case No. 2:18-cv-00900-WBS-EFB. The City filed the operative, Third Amended Complaint (alternatively "West Sacramento's Complaint" or the "West Sacramento Action"), on December 5, 2018. The City is seeking, *inter alia*, money damages from the defendants for costs related to

the testing and cleanup of environmental contamination at and emanating from the Property, as well as nonmonetary and injunctive relief.

17. West Sacramento's Complaint named R and L Business Management, Clark, and Smith as defendants.

### C. Arrowood's Defense Of R And L, Clark, And Smith

18. R and L Business Management, Clark, and Smith requested that Arrowood defend and indemnify them in connection with the West Sacramento Action. Arrowood accepted the tender of defense for R and L Business Management, Clark, and Smith under a reservation of rights.

19. Arrowood timely and fully defended R and L Business Management, Clark, and Smith in connection with the West Sacramento Action.

### D. Industrial Operations At The Property Prior To Stockton Plating, Inc.

20. Beginning in the 1940s, an automobile repair facility operated at the Property. In 1949, the Property was converted for use as a metal plating business.

21. A general partnership, under the name of Capitol Plating, performed metal plating operations at the Property from 1949 to 1960.

22. In or about January 28, 1960, Capitol Plating, Inc. was incorporated and performed metal plating operations at the Property from 1960 until 1973.

23. The plating processes in place between 1960 and 1973 at the Property consisted of placing metal bumpers in large tanks that each contained dissolved nickel, copper, chrome, and rinse water. Employees at the Property during this time placed and then removed bumpers from the tanks. Fluids were "dragged out" from the tanks and fell onto the floor. The process also involved straightening, grinding, and polishing bumpers in a separate room. The straightening, grinding, and polishing process released metal shavings onto the floor and dispersed dust into the air.

24. From at least 1964 until Capitol Plating, Inc. ceased operations at the Property, plating rinse fluids were allowed to flow directly onto the floor and into the floor drain. At times, plating fluids and rinse water exited the building through a man-made hole in the foundation.

CLYDE & CO US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800

The hole in the foundation was intended to accommodate and allow the release of fluids from the building.

### E. R And L's Operations At The Property Beginning In 1973

25. Stockton Plating, Inc. purchased the assets but not liabilities of Capitol Plating, Inc. in 1973 pursuant to a written contract and operated a metal chrome plating facility at the Property between 1973 and 1985.

26. At all times material to Stockton Plating, Inc.'s operations at the Property, its employees utilized a chrome plating process that regularly, routinely, foreseeably, intentionally, and gradually released metals into or onto the Property as part of the ordinary plating operations. Stockton Plating, Inc.'s operations at the Property released metals into or onto the Property as part of the ordinary plating operations through a series of intended and foreseeable processes.

27. Stockton Plating employees straightened, grinded, and polished bumpers in a physical, partition-separated area, separate from the plating operations. Shavings from bumpers fell onto the floor and were dispersed into the air. The grinding and polishing room contained a collector powered by a large fan that gathered dust into a bag. A janitor swept the grinding and polishing rooms at the end of each day, emptied the dust collector bag, and placed dust and shavings into a dumpster outside of the building.

28. As part of the metal plating process, employees referred to as "platers" placed bumpers into a series of tanks filled with dissolved nickel, copper, and chrome solutions. When bumpers were removed from the plating solutions, platers "dragged out" fluids from the tanks and droplets of plating solution fell onto the floor. Platers also placed bumpers into tanks containing rise and, using the same process for the plating tanks, dragged out rinse fluids that also fell onto the floor. Employees also occasionally dropped bumpers as they were removed from plating solutions and rinse water causing fluids to splash onto the ground.

29. From 1973 until 1974, Stockton Plating, Inc. continued to allow plating rinse fluids to flow directly onto the floor in the plating area. Employees placed dirt and gravel on the exterior of the building to prevent fluids from exiting the building through the man-made hole. Fluids eroded the nonpermanent, permeable dirt and gravel wall several times causing employees

to rebuild the wall with additional dirt and gravel. The dirt and gravel wall did not completely prevent the release of plating rinse fluids from the building into or onto the Property in this time period.

30. In 1974, Stockton Plating, Inc. altered its plating operations at the Property to limit the expected and intended release of fluids from the building that were part of its regular business practice spanning several years. Employees constructed a concrete block wall around the metal plating tanks at the Property to direct any fluids into a floor drain. Employees also implemented a water conservation system that significantly reduced the flow of fluids onto the floor that needed to be directed into the floor drain. These changes decreased the amount of fluids on the ground in the plating area and made the release of fluid from the building into or onto the Property less common.

31. Stockton Plating, Inc. continued to discharge fluids from its plating operations into or onto the Property as part of its regular business practices even after changes to its plating processes were implemented in 1974. Fluids continued to be dragged out from plating and rinse tanks during Stockton Plating, Inc.'s operations. Fluids dragged out from the plating and rinse tanks were an expected and intended part of Stockton Plating, Inc.'s business practice. The discharge of fluids dragged out from tanks occurred gradually and were virtually certain to occur from the nature of the plating operations.

32. From 1973 to 1985, Stockton Plating, Inc.'s release of metals from the building into or onto the Property were part of its regular business practice of repeatedly discharging metals or liquids containing metals in the same manner on a daily basis over several years.

33. Stockton Plating, Inc. ceased metal plating operations at the Property in 1985 but used the Property for storage until 1991.

**F.     Fires At The Property In 1973 And 1985**

34. The Property experienced fires in 1973 and 1985 in the grinding and polishing rooms. The 1973 and 1985 fires caused no damage to the plating area and occurred at night after business hours when no work was being performed.

35. The 1973 and 1985 fires did not result in the release or dispersal of fluids from the plating tanks because, at the end of each workday, employees covered the plating tanks.

36. There was no sudden or accidental release of metal plating fluids as a result of the 1973 or 1985 fires because the fires did not damage the plating area and the plating tanks were covered preventing the release of fluids.

37. The 1973 and 1985 fires also did not cause the release of a material amount of dust or metal shavings from the grinding and polishing rooms.  The fires occurred after hours when no employees were present.  A janitor arrived to clean the Property at the end of each workday. He swept the grinding and polishing rooms, emptied the dust collector bag, and removed dust and metal shavings from the grinding and polishing rooms.

38. There was no sudden or accidental release of dust or metal shavings from the 1973 or 1985 fires because, at most, a trivial amount of dust and metal shavings remained in the grinding and polishing rooms when the fires occurred.  The trivial amount of dust and metal shavings that may have remained in the grinding and polishing rooms were not a substantial factor in causing damage to the Property.

**G.   Contamination Of The Property From Industrial Operations**

39. The industrial plating operations of Stockton Plating, Inc. and the entities that operated at the Property prior to 1973 gradually and foreseeably released several thousand pounds of metals into or onto the Property as part of their ordinary operations.

40. The 1973 and 1985 fires did not release more than a trivial amount of dust and metal shavings into or onto the Property, if any release occurred at all.  Dust and metal shavings released from the 1973 and 1985 fires, if any, were not a substantial factor of the environmental contamination subject to the Third Amended Complaint for which the City of West Sacramento seeks damages.

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment: No Duty To Indemnify By Arrowood)**

41. Arrowood realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

5233193

10

COMPLAINT FOR DECLARATORY JUDGMENT

42. An actual controversy has arisen and now exists between Arrowood, on the one hand, and the City of West Sacramento, on the other hand, concerning Arrowood's duties under the Policies.

43. Arrowood contends it has no duty to satisfy any judgment rendered against R and L Business Management, Clark, or Smith in favor of the City of West Sacramento on West Sacramento's Complaint, on the grounds that the Policies do not provide coverage for the claims alleged against R and L Business Management, Clark, and Smith.

44. The City of West Sacramento contends that Arrowood will be obligated to satisfy any judgment entered in the West Sacramento Action up to the policy limits of the Policies.

45. Arrowood desires a judicial determination pursuant to 28 U.S.C. § 2201 of its rights and duties under the Policies, if any, with respect to the aforementioned claims.

46. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without judicial adjudication. Accordingly, Arrowood has no plain, speedy, and adequate remedy at law, and requests a declaratory judgment, adjudging and declaring that Arrowood has no duty to satisfy any judgment rendered against R and L Business Management, Clark, or Smith in the West Sacramento Action.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment: Arrowood Policy Limits)

47. Arrowood realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

48. An actual controversy has arisen and now exists between Arrowood, on the one hand, and the City of West Sacramento, on the other hand, concerning Arrowood's duties under the Policies.

49. Arrowood contends, even if the Court finds that it has a duty to satisfy any judgment rendered against R and L Business Management, Clark, or Smith in favor of West Sacramento on West Sacramento's Complaint, that the applicable limits of the Policies are $500,000 for the allegations in the West Sacramento Action on the grounds that the operative

pleading alleges one occurrence and because the per-occurrence limits are not annualized under Policies.

50. The City of West Sacramento contends that Arrowood will be obligated to satisfy any judgment entered in the West Sacramento Action up to $5,000,000.

51. Arrowood desires a judicial determination pursuant to 28 U.S.C. § 2201 of its rights and duties under the Policies, if any, with respect to the aforementioned claims.

52. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without judicial adjudication. Accordingly, Arrowood has no plain, speedy, and adequate remedy at law, and requests a declaratory judgment, adjudging and declaring that Arrowood has no duty to satisfy any judgment rendered against R and L Business Management, Clark, or Smith in the West Sacramento Action.

**PRAYER**

WHEREFORE, plaintiff Arrowood prays for judgment as follows:

(1) Arrowood requests a judicial declaration pursuant to 28 U.S.C. § 2201 that it has no duty to satisfy any judgment rendered against R and L Business Management, John Clark, or the Estate of Nick Smith on West Sacramento's Complaint, on the grounds that the Policies do not provide coverage for the claims alleged against R and L Business Management, John Clark, or the Estate of Nick Smith for these claims;

(2) If the Court determines that Arrowood has a duty to satisfy any judgment rendered against R and L Business Management, John Clark, or the Estate of Nick Smith on West Sacramento's Complaint, that the applicable limits of the Policies are $500,000 because the City of West Sacramento alleges one occurrence and the occurrence limit is not annualized under the Policies;

(3) For costs of suit incurred herein;

(4) For other such relief as the Court deems just and equitable.

Dated: March 3, 2021						CLYDE & CO US LLP

								By:  */s/ Alexander E. Potente*
								Alexander E. Potente
								Timothy J. Witczak
								Attorneys for Plaintiff ARROWOOD INDEMNITY COMPANY,
								formerly known as ROYAL GLOBE INSURANCE COMPANY and ROYAL INSURANCE COMPANY OF AMERICA

## JURY TRIAL DEMAND

Plaintiff Arrowood Indemnity Company hereby demands trial by jury on all matters so triable.

Dated: March 3, 2021						CLYDE & CO US LLP

								By:  */s/ Alexander E. Potente*
								Alexander E. Potente
								Timothy J. Witczak
								Attorneys for Plaintiff ARROWOOD INDEMNITY COMPANY,
								formerly known as ROYAL GLOBE INSURANCE COMPANY and ROYAL INSURANCE COMPANY OF AMERICA