1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11

12  ARROWOOD INDEMNITY COMPANY, a          No. 2:21-cv-00397 WBS JDP
    Delaware corporation, formerly
13  known as ROYAL INSURNACE
    COMPANY, and successor to ROYAL
14  GLOBE INSURANCE COMPANY,               ORDER RE: CROSS MOTIONS FOR
                                           SUMMARY JUDGMENT
15                Plaintiff,

16      v.

17  CITY OF WEST SACRAMENTO; and
    ROES 1-50, inclusive,
18
                  Defendant.
19

20                        ----oo0oo----

21

22          This is an insurance coverage dispute concerning

23  whether plaintiff Arrowood Indemnity Company ("Arrowood") has an

24  obligation, under its duty to indemnity to pay a Stipulated

25  Judgment against its insureds in a related action, City of West

26  Sacramento v. R and L Business Management, 2:18-cv-900-WBS-JDP

27  (the "R&L Action").  Before the court are the parties' cross

28  motions for summary judgment.  (Docket Nos. 41, 48.)

                                1

1    I.    Factual and Procedural Background

2              As detailed in the court's previous order on the City

3    of West Sacramento's (the "City") Motion to Dismiss, (Docket No.

4    21), the City filed an environmental enforcement action against R

5    and L Business Management ("R&L") as the successor in interest to

6    Stockton Plating, Inc., John Clark, and the Estate of Nick Smith,

7    Deceased, among others, to address environmental contamination at

8    and emanating from 319 3rd St., West Sacramento, California (the

9    "Site").  (Pl.'s First Amended Complaint ("FAC") at ¶ 13 (Docket

10   No. 9).)  On March 10, 2021, the court entered a stipulated

11   judgment against the R&L defendants in favor of the City.  (See

12   id., Ex. F at 16-139.)

13             On March 3, 2021, Arrowood filed this suit seeking a

14   declaration that it has no obligation to satisfy the stipulated

15   judgment because the four insurance policies it and its

16   predecessor had issued to the R&L defendants between 1976 and

17   1986 do not provide coverage.  (See FAC at ¶¶ 48-53.)

18   Alternatively, Arrowood seeks a declaration that even if it has a

19   duty to satisfy the stipulated judgment, the applicable policy

20   limit is $500,000.  (See id. at ¶¶ 54-59.)

21   II.   Summary Judgment Standard

22             A party seeking summary judgment bears the initial

23   burden of demonstrating the absence of a genuine issue of

24   material fact as to the basis for the motion.  Celotex Corp. v.

25   Catrett, 477 U.S. 317, 323 (1986).  A material fact is one that

26   could affect the outcome of the suit, and a genuine issue is one

27   that could permit a reasonable trier of fact to enter a verdict

28   in the non-moving party's favor.  Anderson v. Liberty Lobby,

1    Inc., 477 U.S. 242, 248 (1986).  The moving party can satisfy

2    this burden by presenting evidence that negates an essential

3    element of the non-moving party's case.  Celotex, 477 U.S. at

4    322-23.  Alternatively, the movant can demonstrate that the non-

5    moving party cannot provide evidence to support an essential

6    element upon which it will bear the burden of proof at

7    trial.  Id.  Summary judgment is appropriate when, viewing the

8    evidence in the light most favorable to the non-moving party,

9    there is no genuine dispute as to any material fact.  Acosta v.

10   City Nat'l Corp., 922 F.3d 880, 885 (9th Cir. 2019) (citing

11   Zetwick v. Cnty. of Yolo, 850 F.3d 436, 440 (9th Cir. 2017)).

12         Where, as here, parties submit cross-motions for

13   summary judgment, "each motion must be considered on its own

14   merits."  Fair Hous. Council of Riverside Cnty., Inc. v.

15   RiversideTwo, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal

16   citations and alterations omitted).  "[T]he court must consider

17   the appropriate evidentiary material identified and submitted in

18   support of both motions, and in opposition to both motions,

19   before ruling on each of them."  Tulalip Tribes of Wash. v.

20   Washington, 783 F.3d 1151, 1156 (9th Cir. 2015).  Accordingly, in

21   each instance, the court will view the evidence in the light most

22   favorable to the non-moving party and draw all inferences in its

23   favor.  ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1097

24   (9th Cir. 2003) (citations omitted).

25   III. Discussion of the Parties' Arguments

26         A.   Policies' Insuring Clause

27         In support of its motion, Arrowood argues that the

28   stipulated judgment is not covered by the four policies' insuring

3

agreement.  (Pl.'s Mot. at 14 (Docket No. 41).)  Each policy contains the same insuring agreement, which states: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an <u>occurrence</u> . . . ."  (Def.'s Statement of Facts in Opp'n to Pl.'s Mot. ("Def.'s Statement of Facts") at ¶ 2 (Docket No. 55-4) (emphasis added).)  The policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  (<u>Id.</u> at ¶ 4.)  The burden is on the "insured to establish that the occurrence forming the basis of its claim is within the scope of insurance coverage."  <u>Aydin Corp. v. First State Ins. Co.</u>, 18 Cal. 4th 1183, 1188 (1998).

An "accident" is defined as "an unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause" and "refers to the conduct of the insured for which liability is sought to be imposed on the insured."  <u>Delgado v. Interinsurance Exch. of Auto. Club of S. Cal.</u>, 47 Cal. 4th 302, 308, 311 (2009).  An event is not an accident when "all of the acts, the manner in which they are done, and the objective accomplished occurred as intended by the actor."  <u>Id.</u> at 312.  The insured's intention to cause, or not cause, an <u>injury</u> is irrelevant.  <u>See Collin v. Am. Empire Ins. Co.</u>, 21 Cal. App. 4th 787, 804 (2d Dist. 1994) ("'[A]ccident' refers to the insured's intent to commit the act giving rise to liability, as opposed to his or her intent to cause the consequences of that act.").  The

4

1  definition of occurrence also includes the phrase "neither

2  expected nor intended from the standpoint of the insured" which

3  modifies the term "'injury and damages,' not 'accident.'"  See

4  Delgado, 47 Cal. 4th at 311.

5        Arrowood argues there are six different categories of

6  releases, or alleged releases, from the plating operations and

7  that none of those six categories count as "occurrences" within

8  the meaning of the insurance policies.

9        1.   Concrete Migration Releases

10       The City argues that fluids fell onto the concrete

11  floor during the plating process and "remained on, and passed

12  through the concrete itself because of its porous nature or

13  possibly through cracks in it."  (Def.'s Statement of Facts at

14  ¶ 12.)  These "spills of plating fluids and rinse water occurred

15  as bumpers were moved between tanks" and were not "unexpected" or

16  "unforeseen."  (Def.'s Opp'n at 16 (Docket No. 55)); see Delgado,

17  47 Cal. 4th at 308.  Any releases that occurred through the

18  regular plating process as fluids fell to the floor for years are

19  not an "occurrence" within the meaning of the insuring

20  agreement.  There is no genuine dispute of material fact as to

21  how the fluids spilled onto the floor, and no reasonable jury

22  could find that any release through the concrete was an

23  "occurrence."  Accordingly, summary judgment regarding any

24  alleged releases through the concrete floor will be granted in

25  favor of Arrowood.

26       2.   Hole Releases

27       The City claims that the drain in the plating area

28  would sometimes overflow before a retaining wall was completed in

5

1974.  (See Def.'s Statement of Facts at ¶ 14.)  When the drain

overflowed, fluids ran out of the area and onto the exterior

ground through a hole in the wall.  (Id.)  Fluids had been

spilling out of the hole for nearly 20 years as plating

operations occurred.  (See Decl. of Alexander Potente ("Potente

Decl."), Ex. I, 2019 Depo. of Richard Leland ("2019 Leland

Depo.") at 70:14-21 (Docket No. 44-14).)  John Clark, the manager

of Capitol Plating at the time, piled dirt against the hole to

prevent the discharges.  (Def.'s Statement of Facts at ¶ 15.)

Clark replaced these "dirt dams" five to ten times before

building a retaining wall around the plating area to direct

fluids down a drain in the floor.  (See Def.'s Response to Pl.'s

Statement of Additional Facts ("Def.'s Resp. to Pl.'s Add'l

Facts") at ¶ 62 (Docket No. 64-1).)

     The City unpersuasively argues that Clark did not

"intend or expect the dam to fail," therefore the failure of the

dams was an "occurrence."  (Def.'s Opp'n at 17.)  Clark testified

that, although he built the dam to "stop[ ] any solution [or]

water from coming out" of the hole and thought it would prevent

water from escaping, he also expected the dam to fail because "it

wasn't concrete" and considered it to be "just a deterrent."

(See Potente Decl., Ex. C, 2021 Depo. of John Clark ("2021 Clark

Depo.") at 97:6-10, 106:4-19; 196:23-198:4 (Docket No. 44-6).)

Clark may not have intended for the dirt dam to fail, but Clark's

testimony shows that the dam failing multiple times was not

unexpected or unforeseen, as Clark recognized it would not

prevent water from escaping indefinitely.  See Delgado, 47 Cal.

4th at 308, 311.  There is therefore no genuine dispute of

1   material fact as to the manner in which the releases occurred

2   through the hole, and no reasonable trier of fact could find the

3   releases to be an "occurrence" within the insuring agreement.

4           3.   Sewer Releases

5           The City claims that "occurrences" happened when fluids

6   from the plating area flowed into the sanitary sewer, but were

7   released into the environment because the sewer may have

8   leaked.  (Def.'s Statement of Facts at ¶ 17.)  However, the

9   City's expert, Dr. Anne Farr, testified that there is no actual

10  evidence that there were any releases from the sanitary sewer,

11  through cracks and joints, to the subsurface as this had not been

12  investigated.  (See Potente Decl., Ex. H, Depo. of Anne Farr

13  ("Farr Depo.") at 30:24-31:2 (Docket No. 44-13).)  Even when

14  viewing the facts in the light most favorable to the City, the

15  City has not produced any evidence that releases even occurred

16  from the sanitary sewer, so it cannot carry its burden to

17  demonstrate that these alleged releases are occurrences within

18  the meaning of the insuring agreement.

19          4.   Dumpster Releases

20          The City claims metal particulates were disposed of in

21  an on-site dumpster and that those particulates escaped into the

22  groundwater and soil through "cracks or gaps in the sides or

23  bottom of the dumpster."  (Def.'s Opp'n at 18.)  Dr. Farr states

24  that the particulates "likely escaped the dumpster" and that

25  there was contamination in the area.  (See Decl. of Bret Stone

26  ("Stone Decl."), Ex. 9, Expert Report of Dr. Anne Farr ("Farr

27  Report") at 21 (Docket No. 56-9); Farr Depo. at 123:24-124:8.)

28  However, Dr. Farr also testified that she does not know what the

1  condition of the dumpster was and has no evidence that anyone saw

2  discharges from the dumpster.  (See Farr Depo. at 122:8-11,

3  124:1-3.)  Clark also testified that he did not recall ever

4  seeing any holes in the dumpster. (2021 Clark Depo. at 120:12-

5  13.)

6          The City argues that the area in which the dumpster was

7  kept had contamination, but does not provide sufficient evidence

8  that the contamination came from the dumpster and not another

9  source. (See Def.'s Opp'n at 18.)  Without evidence that the

10 dumpster released these particulates, the City has not carried

11 its burden to demonstrate that these alleged dumpster releases

12 are "occurrences" within the meaning of the insuring agreement.

13                   5.   Fire Releases

14         The City argues that two fires, one in 1973 and one in

15 1985, which damaged the grinding and polishing room and jobbing

16 room at the site, each released metallic dust and plating fluids

17 into the environment.  (See Def.'s Statement of Facts at ¶¶ 21-

18 22.)  The City contends that metals from the polishing, grinding,

19 and jobbing processes were present in these rooms at the time of

20 the fires, that the fires caused some of this metal to be

21 released into the air, and that some of the metal was washed out

22 of the burning structure and onto the ground outside during

23 firefighting efforts.  (See Def.'s Mot. at 17 (Docket No. 48-1).)

24 As discussed in detail below, the amount of contamination that

25 may have occurred due to the fires is in dispute.  However, the

26 fact that the fires happened is not.  At oral argument, Arrowood

27 agreed that both fires are "occurrences" within the policies'

28 insuring agreement.

8

1    However, Arrowood contends that the firefighting

2    efforts involved in the two fires are not "occurrences."

3    Arrowood argues that there is no evidence demonstrating whether

4    the firefighters intended to spray the waste materials or rather

5    "accidentally" sprayed the materials and relies on an out-of-

6    circuit case to further its argument.  (Pl.'s Mot. at 36)  As

7    Arrowood acknowledges, there is no evidence that the firefighters

8    expected, foresaw, and intended to spray the waste materials to

9    release them.  Therefore, there is no genuine dispute of material

10   fact as to whether the firefighting efforts are "occurrences."

11   See Delgado, 47 Cal. 4th at 308.

12       There is therefore no genuine dispute of material fact

13   as to whether the fires and firefighting efforts are

14   "occurrences" within the meaning of the insuring agreement.  The

15   court concludes that the fires are "occurrences" within the

16   meaning of the insuring agreement and will therefore grant

17   summary judgment for the City on this point.

18           6.  Rain Releases

19       The City claims that a large rain event in 1986 likely

20   caused the release of contaminants from the plating area because

21   the roof of the area was not repaired after the 1985 fire.

22   (Def.'s Mot. at 7-8.)  Arrowood relies on Travelers Casualty and

23   Surety Company v. Superior Court, 63 Cal. App. 4th 1440, 1464

24   (6th Dist. 1998), to argue that rain is not a sudden and

25   accidental event, but Travelers does not establish why an

26   unusually large rain event would not qualify as an occurrence and

27   Arrowood makes no argument on this issue.  (See Pl.'s Opp'n at

28   18-21 (Docket No. 52).)  A large rain event in this context is

1   not expected, foreseen, or intended.  See Delgado, 47 Cal. 4th

2   at 308.  Viewing the facts in the light most favorable to the

3   City, there is therefore no genuine dispute of material fact

4   regarding whether the 1986 rain event is an occurrence.  The

5   court determines that the rain event is an "occurrence" within

6   the basic scope of the insuring agreement.

7       In sum, alleged releases through the concrete floor,

8   hole in the wall, sewer, and dumpster are not "occurrences"

9   within the meaning of the insuring agreement and therefore are

10  not covered by the policies.  The fire and rain events are

11  "occurrences" within the meaning of the insuring agreement and

12  are therefore within policy coverage unless an exclusion applies.

13      B.   Pollution Exclusion

14      The parties also dispute whether either of two

15  exclusions removes the stipulated judgment from coverage under

16  the policies.  The first -- the "Pollution Exclusion" -- states

17  that the policies "do[ ] not apply . . . . to bodily injury or

18  property damage arising out of the discharge, dispersal, release

19  or escape of . . . contaminants or pollutants into or upon land,

20  the atmosphere or any water course or body of water."[1]  (Potente

21  Decl., Ex. A-1 at 105 (Docket No. 44-1).)  The insurer bears the

22  burden of proving a policy's exclusion removes an otherwise-

23  covered claim from coverage.  Aydin, 18 Cal. 4th at 1188.

24

25      [1]   Because the Pollution Exclusion operates to remove
otherwise-insured events from coverage, it has no applicability

26  to events not within the basic scope of the policies.  Because
events that are not "occurrences" within the meaning of the

27  policies are not covered, here the court will address only those
events that did constitute occurrences, as explained above.

28

1    The City argues that much of the environmental damage

2  at issue does not fall within the scope of the Pollution

3  Exclusion because some of the discharged pollutants traveled

4  through the ground into groundwater, which the City contends does

5  not constitute a "water course or body of water."  (See Def.'s

6  Mot. at 15.)  However, the City does not contend that any

7  pollutants were discharged directly into groundwater rather than

8  into land.  Nor does the City identify any precedent establishing

9  that contamination from pollutants initially discharged into land

10 ceases to fall within the Pollution Exclusion's scope when those

11 pollutants subsequently migrate downward into groundwater.[2]

12    Rather, a common-sense reading of the Pollution

13 Exclusion's language indicates that "discharge" and similar terms

14 refer to discharges initially made "into or upon land . . . or

15 any water course or body of water," regardless of the subsequent

16 fate of the discharged contaminants.  The phrase "into or upon"

17 is in direct reference to the "discharge" event and thus is best

18 read as describing the initial location within the environment

19 into or upon which contaminants are released.  The only other

20 district court that appears to have addressed this precise issue

21

22    [2]    The authorities the City cites all appear to have
involved releases in which pollutants were at least in part
23 discharged directly into groundwater because the releases
occurred underground.  (See Def.'s Mot. at 15 (citing Aetna Cas.
24 & Sur. Co. v. Dow Chem. Co., 28 F. Supp. 2d 440, 447 (E.D. Mich.
1998); Lumbermens Mut. Cas. Co. v. Plantation Pipeline Co., 447
25 S.E.2d 89, 93 (Ga. Ct. App. 1994); State v. Travelers Indem. Co.
of R.I., 508 N.Y.S.2d 698, 701 (N.Y. App. Div. 1986)).)  This
26 stands in contrast to the facts here, as the parties do not
seriously dispute that the pollutants were in the first instance
27 discharged into the ground from the surface before some of them
migrated downward.
28

1   reached the same conclusion.  See U.S. Fire Ins. Co. v. Bunge N.

2   Am., Inc., 05-2192-JWL, 2008 WL 3077074, at *5 (D. Kan. Aug. 4,

3   2008) (citing Mesa Operating Co. v. Cal. Union Ins. Co., 986

4   S.W.2d 749, 758 (Tex. Ct. App. 1999) (holding same)); see also

5   Standun, Inc. v. Fireman's Fund Ins. Co., 62 Cal. App. 4th 882,

6   888 (2d Dist. 1998) (distinguishing between initial deposition of

7   waste into landfill and subsequent flow of pollutants from

8   landfill into surrounding environment); Travelers Cas. & Sur.

9   Co., 63 Cal. App. 4th at 1461 (rejecting argument that Pollution

10  Exclusion did not apply to groundwater contamination, as

11  contamination had first been discharged into landfill before

12  migrating into groundwater).  Accordingly, that some of the

13  pollutants discharged into or upon the ground at the Site

14  subsequently migrated into groundwater does not remove those

15  discharges from the scope of the Pollution Exclusion.[3]

16        The undisputed facts show that all relevant discharges

17  identified by the City were "into or upon land" or, in the case

18  of any airborne releases from the two fires, "into . . . the

19  atmosphere."  (See Pl's Response to Def.'s Statement of Facts

20  ("Pl.'s Resp. to Def.'s Facts") at ¶ 3 (Docket No. 54); Def.'s

21  Resp. to Pl.'s Add'l Facts at ¶¶ 33-40, 56, 59, 77-88.)  There is

22  therefore no genuine dispute of material fact as to whether the

23  discharges at issue here fall within the basic scope of the

24  ─────────────────

25         [3]  Because the court concludes that the Pollution
    Exclusion encompasses discharges of pollutants "into or upon
26  land" regardless of whether those pollutants subsequently
    travelled into groundwater, it does not reach the issue of
27  whether groundwater constitutes a "water course or body of water"
    within the meaning of the policies.  (See Def.'s Mot. at 15;
28  Pl.'s Opp'n at 30-31; Def.'s Reply at 16-17 (Docket No. 64).)

1  Pollution Exclusion, and the court concludes that they do.

2          1.  <u>Sudden and Accidental Exception</u>

3        The Pollution Exclusion is subject to an exception,

4  however, for discharges that are "sudden and accidental" (the

5  "Sudden and Accidental Exception").  Although an insurer bears

6  the burden of proving that a policy's exclusion precludes

7  coverage of a claim, <u>see Aydin</u>, 18 Cal. 4th at 1188, "[t]he

8  insured under a third party liability policy has the burden of

9  proving . . . an exception to a policy exclusion when the insurer

10 has shown the exclusion applicable," <u>California v. Allstate Ins.</u>

11 <u>Co.</u>, 45 Cal. 4th 1008, 1036 (2009) (addressing Sudden and

12 Accidental Exception).  Because the Pollution Exclusion applies,

13 the City bears the burden of proving that the releases that

14 qualify as occurrences are covered by the Sudden and Accidental

15 Exception.  (<u>See</u> supra n.1.)[4]

16       When determining whether an event is sudden and

17 accidental, the court must first determine which "particular

18 discharges or discharges . . . gave rise to [the] property

19 damage."  <u>See Allstate</u>, 45 Cal. 4th at 1021.  It must then

20 evaluate each discharge separately to determine not only whether

21 it was "sudden" and "accidental," but also whether it was a

22 "substantial factor" in the insured's liability.  <u>See id.</u> at

23 1036-37.

24       An event is "sudden" if it is "abrupt or immediate in

25 nature."  <u>Shell Oil Co. v. Winterthur Swiss Ins. Co.</u>, 12 Cal.

26

27      [4]  As noted in the court's prior order, this burden
applies notwithstanding the fact that the City is the nominal

28 defendant in this declaratory relief action.  (<u>See</u> Docket No. 21
at 8-9.)

App. 4th 715, 755 (1st Dist. 1993).  It is "accidental" if it "is both unintended and unexpected" from the standpoint of the insured.  Id.; Allstate, 45 Cal. 4th at 1024.

To qualify for the exception, the insured must prove that a sudden and accidental event was also "a substantial cause of the injury or property damage for which the insured is liable." Allstate, 45 Cal. 4th at 1036.  Although "[t]he substantial factor standard is a relatively broad one," Bockrath v. Aldrich Chem. Co., Inc., 21 Cal. 4th 71, 79 (1999) (citation omitted), the standard is not met where the insured can do no more than show that the "sudden and accidental event[ ] ha[s] contributed only trivially to the property damage from pollution," Allstate, 45 Cal. 4th at 1037 (citing Travelers Cas. & Sur. Co., 63 Cal. App. 4th at 1460 (insured must show sudden and accidental event caused an "appreciable amount of environmental damage"); Highlands Ins. Co. v. Aerovox Inc., 676 N.E.2d 801, 806 (Mass. 1997) (insured must show sudden and accidental event caused "more than a de minimis amount of the damages for which it is now liable")); see also Bockrath, 21 Cal. 4th at 79 (to qualify as substantial factor, event's contribution must be more than "negligible," "theoretical," or "infinitesimal").

The parties have identified multiple events or forms of discharge that are relevant here.  (See Def.'s Mot. at 15-18; Pl.'s Mot. at 32-36.)  The court will address each of those that it has determined could constitute an "occurrence" in turn.

2.   Fire Releases

The City argues that the September 1973 and September

14

1    1985 fires caused sudden and accidental releases of pollutants

2    into the environment.  (See Def.'s Mot. at 17.)  John Clark and

3    Robert Bennett, who also worked at the facility, testified that

4    each fire destroyed the eastern portion of the facility, which

5    contained the polishing and grinding room and the jobbing room.

6    (See Potente Decl., Ex. F ("Bennett Depo.") at 158:6-16 (Docket

7    Nos. 44-9, 44-10, 44-11); 2021 Clark Depo. at 123:23-124:9.)  The

8    City contends that metals from the polishing, grinding, and

9    jobbing processes were present in these rooms each time a fire

10   occurred, that each fire caused some of these metals to be

11   released into the air, and that some of these metals were washed

12   out of the burning structures and onto the ground outside during

13   both firefighting efforts.  (See Def.'s Mot. at 17.)

14          The parties have not put forward evidence regarding the

15   origin of either fire, but the court has already determined that

16   both fires qualify as accidental, and it will likewise assume

17   that each fire qualifies as sudden, there being no indication

18   that either occurred gradually.  Even so, the evidence

19   demonstrates that the amount of pollutants released as a result

20   of each fire was not more than trivial or de minimis.[5]

21          [5]    The City is required to prove that each fire was a
22   substantial factor in causing the pollution for which the
     insureds were liable.  See Allstate, 45 Cal. 4th at 1021, 1036-
23   37.  However, in its briefing the City simply states that all
     identified releases were substantial factors in causing the
24   Site's pollution without individually addressing whether each
     fire was a substantial factor and why.  (See Def.'s Mot. at 18;
25   Def.'s Reply at 24-25; Def.'s Opp'n at 25-26.)  Nonetheless, the
     court has examined the available evidence in order to make this
26   determination for itself.
            The City's observation that Arrowood stipulated that
27   its insureds' "conduct was a substantial factor in causing the
     nuisance and condition of pollution or nuisance at the Site,"
28

1    The City argues that some of the relevant pollution
2    occurred when plating fluids present in the jobbing room were
3    discharged to the ground by the fires or firefighting efforts.
4    (See Def.'s Mot. at 17.)   It relies on Dr. Farr's report, in
5    which she states that plating of small parts for cars occurred in
6    the jobbing room, citing Bennett's deposition.   (See Farr Report
7    at 18-19 (citing Bennett Depo. at 40:1-2).)   On this basis, in
8    her rebuttal report she also states that "[t]he destruction of
9    the jobbing area would have resulted in a substantial
10   contribution of contamination to the northeastern area of the
11   Site."   (Stone Decl., Ex. 10, Expert Rebuttal Report of Anne Farr
12   ("Farr Rebuttal") at 12 (Docket No. 56-10).)

13        However, in the portion of Bennett's deposition Dr.
14   Farr cites, Bennett merely stated that the room in question "was
15   small jobbing, what we call small parts for cars."   (Bennett
16   Depo. at 39:23-40:2.)   He did not state, then or at any other
17   point during his deposition, that any plating occurred in the
18   jobbing room.   (See generally id.)   Dr. Farr's assertion that it
19   did thus appears to represent an unsupported inference from
20   Bennett's testimony and is therefore insufficient to create a
21   trem triable issue of fact.[6]   Arrowood, on the other hand, has

---

(Def.'s Mot. at 18), evinces an apparent related misconstruction
of the legal standard.   A stipulation that the insured's overall
conduct was a substantial factor is not the same as a stipulation
that each (or any) discrete sudden and accidental event was.

[6]   Accord Travelers Cas. & Sur. Co., 63 Cal. App. 4th at
1662 ("Expert declarations cannot create a triable question of
fact if the expert's opinion is based upon factors which are
remote, speculative, or conjectural.   Particularly, expert
declarations regarding purported sudden and accidental releases
of pollution, which do no more than offer conclusory assertions
or speculation regarding any causal link between the purported

1  submitted a declaration from Bennett specifying that the jobbing

2  room was used for polishing small car parts and that no plating

3  was in fact done there.  (See Potente Decl., Ex. G at ¶ 3 (Docket

4  No. 44-12).)[7]  There is accordingly no genuine dispute of

5  material fact as to whether plating fluids would have been

6  present in the jobbing room at the time of the fires and would

7  therefore have escaped during firefighting efforts.

8      The City also contends that fluid likely escaped from

9  tanks in the plating room because the chrome tank was uncovered

10 and thus water may have entered during firefighting efforts.

11 (See Def.'s Mot. at 17.)  The only evidence that might support

12 this inference is hearsay testimony from Richard Leland, another

13 employee, who testified at his deposition that although there was

14 no damage to the plating room from the 1985 fire, he was told by

15 another person that some water from the firefighting effort had

16 entered tanks in the plating room, diluting some of their

17 contents.  (See 2019 Leland Depo. at 89:6-16, 90:3-19.)  He did

18 not testify that he was told any fluid escaped.  (See id.)  But

19 he did testify that he did not visit the property for about one

20 releases and the claimed damages, are insufficient to defeat

21 summary adjudication.") (citations omitted).

22     [7]   The City has objected to consideration of Bennett's
declaration for purposes of the cross-motions for summary

23 judgment.  (See Docket No. 61-2.)  Although the City states that
the declaration was signed after the close of discovery and that

24 statements it contains were not part of Bennett's deposition
testimony, the City does not explain how consideration of the

25 declaration would be prejudicial.  It also argues that the
statements it contains cannot be presented in an admissible form,

26 but there is no indication that Bennett could not personally
testify to these details at trial, much as he could be called to

27 testify to the details he disclosed during his deposition.  The

28 City's objection is therefore overruled.

1  week after the fire and that when he did, he did not see evidence
2  that water had been sprayed into the plating room.  (See id. at
3  90:8-17.)

4          On the other hand, Clark and Bennett each testified
5  that they arrived at the facility on the mornings after the 1973
6  and 1985 fires, respectively, and saw no evidence water had been
7  sprayed into the plating area on either occasion.  (See 2021
8  Clark Depo. at 123:3-14, 128:12-130:6; Bennett Depo. at 167:24-
9  168:20.)[8]  Dr. Farr's conclusion that fluid from the chrome tanks
10 were "likely" released during the fires is therefore speculative,
11 and the court concludes that there exists no genuine dispute of
12 fact on this point.  See Allstate, 45 Cal. 4th at 1037 (Sudden
13 and Accidental Exception does not apply "where the policyholder
14 can do no more than speculate that some polluting events may have
15 occurred suddenly and accidentally"); Bockrath, 21 Cal. 4th at 79
16 ("theoretical" contribution to harm insufficient to qualify as
17 substantial factor in causing it); Travelers Cas. & Sur. Co., 63
18 Cal. App. 4th at 1462.

19         Finally, the City argues that waste metals which would
20 have been present in the polishing and grinding room would have
21 been washed out during firefighting efforts.  (See Def.'s Mot. at
22 17.)  In that room, during the relevant periods for both fires,

23

24         [8]   Moreover, even if some fluid had spilled out of the
25 chrome tanks during either fire, there is no evidence indicating
   that this fluid was discharged from the building by means other
26 than the floor drain leading to the sewer.  And it is undisputed
   that by the time of the 1985 fire, a retaining wall had been
27 built around the plating area, preventing any releases through
   the hole in the wall.  (See Def.'s Resp. to Pl.'s Add'l Facts at
28 ¶ 65.)

1  workers buffed and sanded bumpers to prepare them for plating, a

2  process which produced fine metal particles.  (Def.'s Resp. to

3  Pl.'s Add'l Facts at ¶¶ 80-81.)   These particles either fell onto

4  the floor or onto instruments in the room, or they were sucked

5  into a dust collector on the wall that was present at the times

6  of both fires.  (Id. at ¶ 82; Stone Decl., Ex. 2 ("2020 Clark

7  Depo.") at 93:1-94:1 (Docket No. 56-2); Bennett Depo. at 166:3-

8  15.)  Clark and Bennett testified that at the end of each day,

9  particles that landed on instruments in the room were blown off,

10 the floor was swept, and the dust was collected into a garbage

11 bag and disposed of.  (2021 Clark Depo. at 48:11-52:20; Bennett

12 Depo. at 54:8-57:6, 58:23-59:22, 157:12-15, 162:16-164:20.)[9]

13        Despite Bennett's testimony that all of the residue

14 produced in the straightening, polishing, and grinding areas was

15 removed during each cleaning, (see Bennett Depo. at 59:15-22,

16 233:14-22), the City argues that some amount of dust would have

17 necessarily remained and therefore would have burned or been

18 washed away during each fire, (see Def.'s Mot. at 17; Farr Report

19 at 16; Farr Rebuttal at 11).  The possibility that a small amount

20 of residual dust not cleaned up at the end of the day may have

21 remained when the fires started, however, does not establish that

22

23        [9]    Although the City disputes that Clark's and Bennett's
   testimony conclusively establish that these cleanings occurred
24 daily, (see Def.'s Resp. to Pl.'s Add'l Facts at ¶ 83), it puts
   forward no evidence to the contrary.  Additionally, although the
25 City contends that Bennett did not personally perform these
   cleanings beyond the early part of his employment at the
26 facility, Bennett testified that he had never arrived at the
   grinding and polishing room in the morning to find that it had
27 not been cleaned the night before.  (See Bennett Depo. at 164:17-
   20.)
28

1  more than a trivial amount would have been present and discharged

2  during the fires.

3          Some of the particles produced in the polishing and

4  grinding room were also sucked into the dust collector, which

5  consisted of a fan in the wall that pulled airborne particles

6  through a duct and into a bag for disposal.  (See 2020 Clark

7  Depo. at 93:1-22; Bennett Depo. at 166:3-167:12.)  Clark

8  testified that this bag was disposed of frequently enough that it

9  was not allowed to become full.  (See 2020 Clark Depo. at 93:6-

10  19.)  Although his and Bennett's testimony conflicted as to

11  whether the bag was disposed of every day, (compare id. at 93:17-

12  22 with Bennett Depo. at 167:13-23), the mere possibility that

13  some metal dust would have been in the dust collector at the time

14  of the fires is insufficient to create a genuine dispute of

15  material fact as to whether any amount of dust discharged during

16  the fires would have been non-trivial.[10]  See Allstate, 45 Cal.

17  4th at 1037.

18          On the evidence presented, a reasonable trier of fact

19  could not conclude that either the 1973 or 1985 fire caused more

20  than a trivial amount of contamination to the site, and thus

21  could not conclude pollution from either fire was a substantial

---

22      [10]   In his expert report, Delfino estimated that at the end

23  of the average day, the total amount of dust that would have
    remained in the polishing and straightening rooms each day,

24  including in the dust collector, would have been between 0.0144
    and 2.08 pounds.  (See Stone Decl., Ex. 18, Expert Report of

25  Thomas Delfino at 12-13 (Docket No. 48-21).)  Although Dr. Farr
    contests the accuracy of these estimates, and therefore the court

26  does not rely on them in reaching its conclusion, they
    nonetheless represent additional evidence that the amount of

27  metal discharged during the fires was negligible.  See Bockrath,
    21 Cal. 4th at 79.

28

1  factor in causing the damage for which the insureds were liable.

2  See id.  The court will therefore deny summary judgment on this

3  point for the City and grant it for Arrowood.

4          3.   Rain Releases

5          The City also argues that a rain event in February 1986

6  caused a sudden and accidental release of pollutants.  (See

7  Def.'s Mot. at 17.)  It contends that the plating area's roof was

8  damaged during the 1985 fire and was not repaired, and that the

9  rain would have then entered through the missing portion of the

10 roof.  (See id.)  It argues that this "would have resulted in

11 further migration of the contamination at and under the plating

12 building as a result of infiltration of water through the plating

13 building foundation."  (Id.)

14         Although Leland testified that the 1985 fire "did some

15 damage in the plating department," he does not appear to have

16 specified that the roof was damaged.  (See Stone Decl., Ex. 6,

17 2020 Deposition of Richard Leland ("2020 Leland Depo.") at 38:16-

18 39:6 (Docket No. 48-11).)  On the other hand, Bennett testified

19 that he arrived at the facility the morning after the 1985 fire

20 and saw no damage to the plating area, including to the roof.

21 (See Bennett Depo. at 167:24-168:12, 174:10-17, 175:13-15.)

22         Bennett also testified that the facility was not

23 repaired or rebuilt after the 1985 fire.  (See id. at 168:21-

24 169:11.)  He testified that beginning roughly one week after the

25 fire, he and another person cleaned and packed up the plating

26 shop, including by emptying the tanks, storing the solution in

27 waste barrels, removing the tanks and other equipment from the

28 premises, and cleaning the plating room.  (See id. at 176:20-

1   180:22, 237:2-15.)

2           The City has not put forward evidence to indicate that

3   any meaningful amount of plating materials or other residual

4   contaminants were present in the plating room at the time of the

5   rain -- whereas Arrowood has put forward evidence to the contrary

6   -- and that would thus have migrated downward through the floor

7   in the manner the City suggests.  To the extent that the City

8   argues the rain caused contaminants that had already passed

9   through foundation and into the soil to migrate further downward,

10  precedent makes clear that this does not constitute a discharge

11  that may satisfy the Sudden and Accidental Exception.  Cf.

12  Standun, 62 Cal. App. 4th at 889-90 (holding, in suit over

13  release of pollutants from landfill into surrounding environment,

14  that discharge to be analyzed for purposes of Sudden and

15  Accidental Exception is initial deposition of wastes into

16  landfill, not subsequent migration of pollutants therefrom);

17  Travelers Cas. & Sur. Co., 63 Cal. App. 4th at 1463 (citation

18  omitted).

19          Even viewing the evidence in the light most favorable

20  to the City, and therefore assuming that there was indeed a hole

21  in the roof after the 1985 fire, the City has failed to show that

22  a non-trivial amount of contaminants would have been present in

23  the plating room at the time of the rain and could therefore have

24  been discharged from the building because of the rain.  The only

25  evidence on this point is that which Arrowood has offered, which

26  demonstrates the opposite.  Accordingly, the court concludes that

27  there is no genuine dispute of material fact and that, on the

28  evidence presented, a jury could not reasonably conclude that the

1   1986 rain event caused a sudden and accidental discharge of

2   pollutants.  Therefore, on this issue, the court will deny the

3   City's motion and grant summary judgment for Arrowood.

4          Because the court has concluded that none of the events

5   that qualify as occurrences fall within the Sudden and Accidental

6   Exception, the contamination for which the City seeks

7   indemnification is excluded from coverage under the policies'

8   Pollution Exclusion.[11]

9          IT IS THEREFORE ORDERED that the City's motion for

10  summary judgment be, and the same hereby is, DENIED.

11         IT IS FURTHER ORDERED that Arrowood's motion for

12  summary judgment be, and the same hereby is, GRANTED.

13         The Clerk is hereby directed to enter Judgment,

14  pursuant to 28 U.S.C. § 2201, declaring that plaintiff Arrowood

15  Indemnity Company has no duty to satisfy the Judgment entered

16  against R and L Business Management, John Clark, and the Estate

17  of Nick Smith in the case City of West Sacramento v. R and L

18  Business Management, 2:18-cv-900 WBS JDP, and to close the file

19  accordingly.

20         IT IS SO ORDERED

21  Dated:  January 11, 2022

        WILLIAM B. SHUBB
22      UNITED STATES DISTRICT JUDGE

23

24

25

26      [11]    Because the Site contamination is excluded from
    coverage under the Pollution Exclusion, the court does not reach
27  the issues of whether the Owned Property Exclusion applies or of
    what the applicable policy limits would be for non-excluded
28  occurrences.

                                23